Filed 9/21/21  P. v. Lopez CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CESAR LOPEZ,<br><br>        Defendant and Lopez. | A159355<br><br>(San Francisco County<br>Super. Ct. No. 219514) |

In February 2013, Cesar Lopez was charged by the San Francisco District Attorney with one count of felony stalking.  (Pen. Code, § 646.9, subd. (a).)[1]  After he pleaded not guilty, a jury convicted him of the charge on May 13, 2013.  The court suspended sentence and granted Lopez probation on July 3, 2013.

On August 18, 2015 we affirmed the judgment, rejecting Lopez's claim that his conviction was not supported by substantial evidence.[2]  (*People v. Lopez* (2015) 240 Cal.App.4th 436, review den. Dec. 9, 2015.)

---

[1] All statutory references are to the Penal Code.

[2] Our 2015 opinion describes the facts of Lopez's offense at considerable length.  As the facts are not essential to our analysis here, suffice it to summarize them as follows:  Lopez's 10-year obsession with his victim, Angie, began when she was 16 and he was about 26, and continued relentlessly for many years while she was a college student and thereafter, despite the assistance she obtained from the police and her repeated efforts to stop him.

1

On February 22, 2019, after he successfully completed five years of probation, Lopez filed a motion in propria persona[3] to vacate his 2013 conviction of felony stalking pursuant to section 1473.7, which allows persons "no longer imprisoned or restrained" to prosecute a motion to vacate a conviction or sentence if "[t]he conviction or sentence is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential

---

Lopez told Angie he knew where she lived and where she went, and repeatedly refused to accept her attempts to end what he considered their relationship. After Angie ceased communicating with Lopez, he maintained a presence in her life by sending packages and oblique but ominous messages to her at her mother's address. Lopez ignored Angie's increasing pleas to leave her alone even after the intervention of the police. Although he never explicitly threatened her with violence, Angie testified that "she was 'afraid for myself' and 'needed people around me to know what was going on. . . . I didn't know what was going to happen and I felt in fear for my safety.' " (*People v. Lopez, supra,* 240 Cal.App.4th at p. 445.) Angie repeatedly came across Lopez near her home and found him watching her from a distance or suddenly appearing close to her. (*Id.* at pp. 441–443.) In 2012, Lopez constructed a large "labyrinth" in the shape of Angie's face on Bernal Hill near her home, which "terrified" her. (*Id.* at pp. 439–440.) At this time, Lopez sent her a link to a blog she interpreted as inviting her to meet him for a "healing ceremony" on Bernal Hill near the labyrinth, at 4:30 p.m., on a specified date. Knowing Lopez would continue harassing her despite the involvement of the police and her pleas that he stop, Angie experienced " 'intense anxiety and fear and a sense of hopelessness in the situation.' " (*Id.* at p. 444.)

[3] After the motion was filed, Lopez engaged private counsel to respond to the People's opposition to the motion. However, shortly after private counsel filed that response, Lopez informed the court that he wished to again represent himself. After Lopez was advised of his right to court-appointed counsel and other constitutional rights, he signed a "Faretta Waiver," indicating he had been advised by the court of his right to counsel and other constitutional rights and waived those rights. Lopez represented himself at the hearing on the motion without the assistance of counsel.

2

adverse immigration consequences of a plea of guilty, or nolo contendere." (§ 1473.7, subd. (a)(1).) As amended, the statute states that "[a] finding of legal invalidity may, but need not, include a finding of ineffective assistance of counsel." (*Ibid*.) Lopez's motion asserts that he has "established by a preponderance of the evidence, that his defense attorney provided ineffective assistance of counsel at crucial stages of [the 2013] proceedings, thus damaging his ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of his offered plea of guilty, leading to his detrimental decision to go to a high-risk jury trial."

Lopez's motion to vacate his conviction was denied on the ground he understood the adverse immigration consequences of pleading not guilty and going to trial, and was therefore not prejudiced under section 1473.7. We shall affirm that ruling.

## DISCUSSION

### *The Statutory Scheme*

As we recently explained in *People v. Rodriguez* (2021) 68 Cal.App.5th 301 (*Rodriguez*), section 1473.7 was enacted in 2016 because the Legislature was concerned that noncitizens who were no longer in custody had no remedy for challenging convictions resulting from their entry of no contest or guilty pleas that, unbeknownst to them at the time, could adversely impact their immigration status. "For many years, adverse immigration consequences of guilty pleas were considered indirect or collateral matters, and thus trial courts were not required to advise defendants of them. [Citation.] In 1977 the Legislature enacted section 1016.5 (added by Stats. 1977, ch. 1088, § 1), which requires trial courts to advise criminal defendants, 'If you are not a citizen, you are hereby advised that conviction of the offense for which you

3

have been charged may have the consequences of deportation, exclusion from admission to the United States or denial of naturalization pursuant to the laws of the United States.' (§ 1016.5, subd. (a).) Defense attorneys, however, were still under no particular duty to discuss those potential adverse immigration consequences with their clients, although an affirmative misrepresentation about them could constitute ineffective assistance. [Citation.] . . .

"In 2010, the United States Supreme Court issued *Padilla v. Kentucky* (2010) 559 U.S. 356 (*Padilla*). It held that an attorney is constitutionally ineffective under the Sixth Amendment if he or she fails to advise a client-defendant of the actual or potential adverse immigration consequences of pleading guilty to a criminal charge. In 2015, the California Legislature enacted section 1016.3, which essentially codified the holding of *Padilla* by requiring defense counsel to 'provide accurate and affirmative advice about the immigration consequences of a proposed disposition,' and when consistent with the defendant's informed consent and with professional standards, 'defend against those consequences.' (2015 Stats., ch. 705, § 2, eff. Jan 1, 2016.)

"In the meanwhile, however, the Supreme Court, in *Chaidez v. United States* (2013) 568 U.S. 342, had held *Padilla* is *not* retroactive. Thus, *Padilla* does not provide grounds for vacating a conviction that was final prior to 2010 by a defendant who was not properly advised by counsel of the actual or potential adverse immigration consequences of a guilty or no contest plea.

"In 2016, the California Legislature adopted section 1473.7, effective January 1, 2017. Section 1473.7, subdivision (a) as originally written 'creat[ed] a mechanism to allow individuals who are no longer imprisoned to move to vacate a conviction or sentence on the ground that "[t]he conviction

4

or sentence is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a plea of guilty or nolo contendere." ' [Citations.] Former section 1473.7, subdivision (e)(1) provided (and continues to provide), '[t]he court shall grant the motion to vacate the conviction or sentence if the moving party establishes, by a preponderance of the evidence, the existence of any of the grounds for relief specified in subdivision (a).' (Stats. 2016, ch. 739, § 1; § 1473.7, subd. (e)(1).) Further, '[i]f the court grants the motion to vacate a conviction or sentence obtained through a plea of guilty or nolo contendere, the court shall allow the moving party to withdraw the plea.' (Stats. 2016, ch. 739, § 1; § 1473.7, subd. (e)(3).)" (*Rodriguez, supra*, 68 Cal.App.5th at pp. 308–309.)

Our opinion in *Rodriguez* also reiterated legislative declarations of the purpose of the foregoing legislation, which was " 'to "fill a gap in California criminal procedure" (Pub. Safety, Rep. on Assem. Bill No. 813, at p. 5) by providing a means to challenge a conviction by a person facing possible deportation who is no longer in criminal custody and thus for whom a petition for habeas corpus is not available: "California lags far behind the rest of the country in its failure to provide its residents with a means of challenging unlawful convictions after their criminal sentences have been served. . . . [¶] This omission has a particularly devastating impact on California's immigrant community . . . . Many immigrants suffer convictions without having any idea that their criminal record will, at some point in the future, result in mandatory immigration imprisonment and deportation, permanently separating families. [¶] . . . . Challenging the unlawful criminal conviction is often the only remedy available to allow immigrants an opportunity to remain with their families in the United States. Yet, in

5

California, affected individuals have no way of challenging their unjust convictions once probation ends, because they no longer satisfy habeas corpus' strict custody requirements." (Pub. Safety, Rep. on Assem. Bill No. 813 at pp. 4–5.) [The new legislation] 'creates a new mechanism for post-conviction relief for a person who is no longer in actual or constructive custody. Specifically, it allows a person to move to vacate a conviction due to error affecting his or her ability to meaningfully understand, defend against, or knowingly accept the actual or potential immigration consequences of the conviction." ' " (*Rodriguez, supra*, 68 Cal.App.5th at p. 309, quoting *People v. Fryhaat* (2019) 25 Cal.App.5th 969, 976–977, citing Sen. Com. on Pub. Safety, Rep. on Assem. Bill No. 813 (2015–2016 Reg. Sess.) June 22, 2015 [the bill that became former § 1473.7].)

Unlike the *Padilla* rule, section 1473.7 applies retroactively, allowing challenges to pleas entered into before the statute was adopted. (*People v. Perez* (2018) 19 Cal.App.5th 818, 824–829.)

***The Standard of Review***

In *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*), our Supreme Court adopted an independent standard of review for *all* claims—factual and legal—made pursuant to section 1473.7, subdivision (a)(1). Under that standard of review, " 'an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law.' [Citation.]" Courts exercising such review should be mindful that " ' "[i]ndependent review is *not* the equivalent of de novo review . . . ." ' [Citation.] An appellate court may not simply second-guess factual findings that are based on the trial court's own observations. [Citations.] . . . [F]actual determinations that are based on ' "the credibility of witnesses the [superior court] heard and observed" ' are entitled to particular deference, even though courts reviewing such claims

6

generally may ' "reach a different conclusion [from the trial court] on an independent examination of the evidence . . . even where the evidence is conflicting." ' [Citation.] In section 1473.7 proceedings, appellate courts should similarly give particular deference to factual findings based on the trial court's personal observations of witnesses. [Citation.] Where, as here, the facts derive entirely from written declarations and other documents, however, there is no reason to conclude the trial court has the same special purchase on the question at issue; as a practical matter, '[t]he trial court and this court are in the same position in interpreting written declarations' when reviewing a cold record in a section 1473.7 proceeding. [Citation.] Ultimately it is for the appellate court to decide, based on its independent judgment, whether the facts establish prejudice under section 1473.7." (*Vivar, supra,* 11 Cal.5th at pp. 527–528.)

Accordingly, our determination whether the facts establish the prejudice required by section 1473.7 need not defer to the trial court's interpretation of the written declarations and documents produced by the parties. As will be seen, Lopez's request for an evidentiary hearing was denied and the motion to vacate was denied primarily on the basis of declarations and other written documents presented by Lopez and the People prior to the hearing on the motion. However, denial of the motion also appears to have been based on the court's personal observations of Lopez's conduct and statements at the hearing on the motion, at which Lopez was representing himself. Thus, to some extent, the challenged ruling was made on the basis of the court's assessment of Lopez's personal credibility.

### Lopez's Claims

Acknowledging that the text of section 1473.7 refers only to defendants who enter pleas, Lopez maintains that the relief provided by section 1473.7

"is available for any defendant with immigration consequences attributable to a conviction that occurred due to an error in the plea process that damaged the defendant's ability to make an intelligent choice on how to plead . . . regardless of whether their conviction arose from a plea of guilty or not guilty."  Lopez argues the statute must be interpreted in light of section 1061.2, pointing to the observation in *Vivar* that the 2018 amendment to section 1473.7 (which expanded the category of defendants who could obtain relief by eliminating any requirement that the defendant establish ineffective assistance of counsel)[4] "instructed courts to interpret section 1473.7 'consistent with the findings and declarations made in section 1016.2 . . . .' (Stats. 2018, ch. 825, § 1, subd. (c).)"  (*Vivar, supra,* 11 Cal.5th at p. 525.) Those findings and declarations articulate a purpose to "codify *Padilla* . . . and related California case law and encourage the growth of such case law in furtherance of justice."  (§ 1016.2, subd. (h).)  Lopez argues the section 1016.2 legislative declarations and findings constitute a legislative interpretation of the 2018 amendment of section 1473.7 to "*expand upon*" *Padilla* and related California cases holding that defense counsel must investigate and advise regarding immigration consequences of the available dispositions, and defend against adverse immigration consequences.  (§ 1016.2, subd. (a).)  In effect, Lopez argues that because the paramount consideration is providing non-

---

[4] Initially section 1473.7 required moving parties who claimed prejudicial error as a result of erroneous or inadequate advice from counsel to show that counsel's performance fell below an objective standard of reasonableness under standards prevailing at the time of the conduct (*Strickland v. Washington* (1984) 466 U.S. 668, 690), as well as a reasonable probability of a different outcome if counsel had provided effective assistance. (*People v. Camacho* (2019) 32 Cal.App.5th 998, 1005.)  However, in 2018, the Legislature amended section 1473.7, subdivision (a)(1), to read that a finding of legal invalidity due to prejudicial error " 'may, *but need not, include a finding of ineffective assistance of counsel.*' "

8

citizen defendants "an accurate understanding of immigration consequences" (§ 1061.2, subd. (d)), it should not matter whether the defendant ultimately decides to enter a plea or go to trial; the defendant who, like Lopez, decides not to enter a plea has as much need of an accurate understanding of the immigration consequences as the defendant who decides to plead not guilty.[5] Indeed, Lopez contends that interpreting section 1473.7 as applicable to convictions resulting from a plea but not to convictions resulting from the verdict of a jury, would violate the equal protection clauses of the federal and state Constitutions.

According to Lopez, the key inquiry in this case "is whether it is more likely than not, that the adverse immigration consequences could and would have been prevented, but for the plea-related error" he has raised. He argues the adverse immigration consequence of his conviction, deportation, "could and would have been prevented but for the error of trial counsel [Douglas] Welch in failing to barter for an immigration-safe alternative plea. It is undisputed that Welch made no such efforts, and that Lopez did not know of the option. It is also undisputed that, had Lopez elected to pursue an immigration-safe plea instead of going to trial, the San Francisco County District Attorney would have accommodated that goal."

---

[5] There are problems with these arguments. To begin with, neither *Padilla* nor the related California cases identified in subdivision (a) of section 1016.2—i.e., *People v. Soriano* (1987) 194 Cal.App.3d 1470; *People v. Barocio* (1989) 216 Cal.App.3d 99; and *People v. Bautista* (2004) 115 Cal.App.4th 229—relate to section 1473.7 or the situation in this case or suggest a legislative intent to provide the benefits of section 1473.7 to defendants who do not enter pleas and are found guilty at trial. Moreover, as the People emphasize, defendants convicted at trial ordinarily have an appellate remedy and, if confined, can also obtain a remedy by means of the writ of habeas corpus.

The immigration-safe plea Lopez says was available, which he claims he would have accepted if it had been offered, was to section 653m, making telephone calls with intent to annoy.

***The Position of the People***

The People have consistently maintained that section 1473.7 is inapplicable to Lopez's situation because it makes no mention of defendants whose convictions resulted from a trial and provides protection only to defendants convicted on the basis of a plea, as defendants convicted by a trier of fact do not need the remedy provided by the statute.

The Attorney General initially relies on the plain language of section 1473.7, which provides only "two reasons to challenge a conviction or sentence: (a) prejudicial error damaging the moving party's ability to meaningful understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a plea of guilty or nolo contendere (§ 1473.7, subd. (a)(1)); or (b) newly discovered evidence of actual innocence . . . ." (*People v. Perez, supra*, 19 Cal.App.5th at p. 826.) With respect to Lopez's equal protection claim, the Attorney General contends defendants convicted as a result of a guilty plea are not similarly situated to those convicted by a jury, and section 1473.7 was designed only to protect the former.[6]

_____

[6] The Attorney General also argues that Lopez could have raised this constitutional claim in the trial court and in his direct appeal, and his failure to do so forfeits the claim. Lopez concedes the "equal protection argument was not raised below," but argues that it is "useful to the analysis at hand," citing *People v. Abbaszadeh* (2003) 106 Cal.App.4th 642, 648, for the proposition that "a defendant need not object if it would have been futile to do so," and urges us to exercise our discretion to address the constitutional issue he raises for the first time on appeal. As will be seen, we find it unnecessary to decide the merits of the equal protection issue.

10

As the Attorney General sees it, section 1473.7 is "an outgrowth" of the requirement that the court and counsel advise those pleading guilty or no contest of the immigration consequences of their plea. Section 1016.5 describes the advisements that must be given noncitizens who elect to accept plea offers and section 1473.7, provides a review process for such defendants who discover they were inadequately advised about immigration consequences only after they were released from custody. Unlike defendants who enter pleas, who generally cannot appeal their convictions, a defendant who is convicted after a trial can raise any issue about inadequate advice during plea negotiations on appeal. According to the Attorney General, defendants convicted after trial do not require the remedy provided by section 1473.7, which is meant to enforce the protections afforded to defendants who elect to give up their right to trial and enter a plea of guilty or no contest.

The Attorney General also points to the observation of the federal district court, in denying Lopez habeas relief in 2019, that "as [Lopez] concedes, his conviction for stalking is not an aggravated felony for immigration purposes" (*Lopez v. Attorney General* (N.D.Cal. Jan. 11, 2019) No. 16-cv-02479) [2019 WL 11005488, *14]), and notes that Lopez was under an immigration hold even prior to his conviction due to having out-stayed his visa.

### Lopez Was Not Prejudiced Under Section 1473.7

As earlier noted, the prejudice Lopez claims arises out of "the error of trial counsel Welch in failing to barter for an immigration-safe alternative plea" to violation of section 653m. Lopez claims it is undisputed Welch made no such efforts, Lopez was ignorant of such an option, and if one had been found the district attorney would have accepted it. Lopez's ultimate factual claims are that he "would have entered an immigration-safe plea instead of

going to trial if he had known that option was available," and that "the circumstances themselves corroborate that claim."[7]

The circumstances established by the record clearly do *not* corroborate Lopez's claims by a preponderance of the evidence.

In a declaration attached to his opposition to Lopez's motion, the prosecutor, Assistant Deputy Attorney Jerry P. Coleman, stated that he had examined the district attorney's entire case file regarding Lopez's 2013 trial and "could find no mention of any formal offer conveyed or refused, let alone any mention of annoying telephonic phone calls." Deputy District Attorney Quigley, who was assigned to handle Lopez's preliminary hearing in 2013, told Coleman that Lopez felt he should have been offered a plea to misdemeanor stalking in violation of section 653m by making annoying telephone calls. Quigley recalled "initial offer discussions with defense counsel concerning possible misdemeanor stalking," but Quigley "never offered one or more pleas to misdemeanor annoying telephone calls" or any other offenses. Coleman stated at the hearing that "the only preliminary

---

[7] In support of this point, Lopez cites the following portion of *Lee v. United States* (2017) 582 U.S. ___, 137 S.Ct. 1958: "[C]ommon sense (not to mention our precedent) recognizes that there is more to consider than simply the likelihood of success at trial. The decision whether to plead guilty also involves assessing the respective consequences of a conviction after trial and by plea. [Citation.] When those consequences are, from the defendant's perspective, similarly dire, even the smallest chance of success at trial may look attractive. For example, a defendant with no realistic defense to a charge carrying a 20-year sentence may nevertheless choose trial, if the prosecution's plea offer is 18 years. Here, Lee alleges that avoiding deportation was *the* determinative factor for him; deportation after some time in prison was not meaningfully different from deportation after somewhat less time. He says he accordingly would have rejected any plea leading to deportation—even if it shaved off prison time—in favor of throwing a 'Hail Mary' at trial." (*Lee*, at pp. 1966–1967.)

discussions [Quigley's] office engaged in prior to trial, were to a misdemeanor stalking charge, which at that time [unlike now] would have been immigration unsafe" so the plea discussions "never got beyond the very preliminary stage."

Coleman further declared that Assistant District Attorney Karen Catalona, who prosecuted Lopez's 2013 case, told him "she never conveyed any offer concerning misdemeanor annoying telephonic calls; further, it was her belief that defendant steadfastly maintained his innocence and wanted to pursue trial to a possible not guilty verdict so he could continue his one-sided relationship with the victim."

Coleman also stated in his declaration that he asked Welch, Lopez's trial counsel in 2013, about remarks relating to immigration consequences which Lopez said Welch made at a *Marsden* hearing during the 2013 proceedings, and that Welch confirmed having made the remarks. A reporter's transcript of the *Marsden* hearing attached as an exhibit to Coleman's declaration, shows that Welch understood that the immigration consequences of misdemeanor and felony stalking were then the same, and advised Lopez of those consequences. Welch stated at the *Marsden* hearing, "At no point did I say anything other than a stalking conviction will have severe immigration consequences that will be deportable."

At the hearing on Lopez's motion, Coleman emphasized that at the time of the preliminary hearing and trial, Lopez was knowledgeable about immigration issues because he was subject to a United States Immigration and Customs Enforcement (ICE) hold for overstaying the time specified in his visa. Coleman told the court that Lopez "went to trial because he felt he was not guilty and he believed the acts were not criminal, but fully knowing that he might well be deported after that trial."

13

Lopez did not present any evidence that conflicted with any of the prosecutors' statements described in Coleman's declaration. However, in a declaration, Lopez represented that "trial counsel, Douglas Welch, only mentioned the offered disposition once during the preliminary hearing held on January 28, 2013, by saying the following: *'the prosecution is offering a misdemeanor of making annoying calls and emails plus a 10-years restraining order . . . . But I don't know the immigration consequences of it.'* " Lopez's declaration went on to say, "I was definitively never informed about a misdemeanor stalking offer, if any. Trial counsel never advised me about consequences of any disposition, nor to plead guilty as most defendants are advised to avoid a harsher sentence and jail time." Lopez acknowledged, "[a]ll I knew then was that a stalking felony conviction was likely deportable and carried from 1 to 3 years of jail/prison time, potential probation."

Lopez's claims that he was or might have been offered an immigration-safe plea to violation of section 653m are not independently corroborated and are inconsistent with the undisputed statements of the multiple deputy district attorneys who dealt with him after he was arrested and charged, set forth in Coleman's declaration. Moreover, the evidence the prosecution presented shows that, despite defense counsel's admonition that a not guilty plea might result in deportation, Lopez had no interest in an immigration-safe plea. He knowingly pled not guilty in order to satisfy his desire to prove his innocence and thereby hopefully restore a relationship with Angie. Indeed, that knowing plea of not guilty is shown not only by the evidence produced by the prosecution, but by Lopez's own statements in open court.

Near the end of the December 2, 2019 hearing, the court suggested Lopez respond first to the prosecutor's argument that section 1473.7 relates only to defendants who enter guilty pleas, and "doesn't talk about defendants

14

who elect to go to trial." Moreover, the court added, "even if it did, can you credibly say that you didn't understand the immigration consequences of your choice to go to trial?" Lopez indicated that he could do so, and asked the interpreter present to read to the court a statement he had prepared in Spanish, which the interpreter read to the court in English.

The statement, which consumes almost five pages of the reporter's transcript, ignored the two issues in which the court expressed interest—the apparent application of the statute only to guilty pleas and the credibility of Lopez's claim he was ignorant of the adverse immigration consequences—but focused instead on the reasons Lopez felt he had been wrongly convicted and the justice he sought. The most salient portions of the statement are as follows:

" 'My stalking charge originated from unresolved personal issues and depression, when I acted out of obsessive and harassing on an ex-friend of mine and I got a deserved arrest and a civil stay-away order. However, what ensued after the charge was dismissed and refiled was unnecessary on so many levels, but a safe misdemeanor plea deal would have sufficed to me if advised.

" 'My conduct did not endanger anybody since there was not any actual threat, sexual, or violent behavior involved. There is a big difference when you act with malicious intent than when your intent is construed as a subjective inferred threat out of a course of expressive conduct and a contradictory inflammatory stalking narrative out of revenge.

" 'If you have a glance at my case, it's evident that I was denied the right to free speech, to liberty, to privacy, to bail out, to Miranda, to efficient counsel assistance, to speedy fair trial, to testify, to self-representation and equal protection.' " In closing, Lopez " 'respectfully request[ed] this court to

15

not prejudice my case for reasons of my self-representation and personal background in order to make a fair decision  Because if my motion gets granted, aside from vindicating natural rights and vindicating an unlawful stalking precedence, which is a necessary 1473.7 precedent, this court will further the transparency and fairness of the state justice system, which is what the Legislature and the city have been diligently working on over the last five years.' "

Near the end of the lengthy statement Lopez asserted, "[w]hether counsel deliberately misadvised defendant to force a trial is unclear. However, the result was the same; an unfair jury trial in which he became the target of constant attacks to his personal and moral integrity from witnesses and prosecutors attempting to demonize him and his artistic expressive conduct, absent a credible threat and most elements of stalking offense.  While trial counsel omitted meritorious claims and made egregious tactical errors which undermined his defense, thus heavily leaning the balance towards a guilty verdict.  All of which played against defendant at a disastrous sentence hearing where he was called an 'extreme narcissist' due to all the misinformation from trial, pre-sentence report and victim impact statement, causing to have all his pre-judgment motions and affidavit declaration of facts overlooked and summarily denied."

Unpersuaded by Lopez's attempt to exonerate himself, the court observed that he failed to explain why section 1473.7 should apply to a defendant like him who did not plead guilty, and "I haven't heard anything in that very, very lengthy statement, or anyplace else, that tells me that you didn't know what the immigration consequences were as opposed to you don't think that they should be what they are."  The court allowed that Lopez "may be right about what the law should be, . . . but under the law as it is—and I'm

16

obligated to apply the law as it is—you are not entitled to section 1473.7 relief."

Lopez's only effort to persuade the trial court that section 1473.7 should be deemed applicable to defendants convicted after pleading not guilty consisted of the following disquisition on "the spirit of the statute": "[D]ating back to the time of Christ, there has always been a vigorous debate at the foundation and source of the Western legal tradition pitting 'the spirit of the law' versus 'the plain language of the law.' . . . In general, when one obeys . . . the spirit of the law but not the letter, one is doing what the authors of the law intended, though not necessarily adhering to the literal wording." According to Lopez, the spirit of section 1473.7 "provides a remedy for those immigrant defendants previously without a remedy. In this case, defendant was mis-advised and ill-informed as to the immigration consequences of accepting a deal versus going to trial and losing. There is no evidence that his counsel ever zealously protected the defendant from negative immigration consequences by investigating an immigration-safe resolution, by alerting the district attorney as to his immigration concerns for his defendant, or by doing his due diligence in investigating the consequences to his immigration status."

The court rejected this argument because it found no evidence Lopez was "misadvised and ill-informed." As we have said, according to the undisputed statements of the multiple deputy district attorneys who dealt with Lopez after he was arrested and charged, he had no interest in pleading guilty to an immigration-safe offense. Lopez's overarching desire was to prove his innocence of the charged offense, and in order to achieve that goal, he knowingly accepted the possibility of deportation, of which he was advised by his counsel.

17

The court observed that Lopez's statement expressed "your frustrations with the criminal justice process" and your disappointment "about the fact that you have not been able to get your conviction overturned," but "I can't award section 1473.7 relief to someone who in no way seems to have been prejudic[ed], . . . meaning that you couldn't knowingly and meaningfully defend against the consequences of your plea" because "you didn't plead."

Additionally, the court noted that Lopez was at all material times subject to an ICE hold for overstaying the time prescribed by his visa. "You were living immigration consequences at that time, right? So, . . . your situation is just not what this statute contemplates."

The court denied Lopez's request for an evidentiary hearing because "I don't know what the hearing would be on. You have done nothing at the threshold that tells me that we're even in the universe of section 1473.7."

At the close of the hearing on the motion, the court told Lopez it denied relief "because you were not a defendant who was not meaningfully advised of the immigration consequences of your plea or anything else that you were doing. [¶] The only facts in the record that I can see that relate to a plea which you chose not to take are your former lawyer saying he advised you about the immigration consequences of stalking and at the time [the immigration consequences] were the same, felony or misdemeanor . . . ." The court said it could not find Lopez was prejudiced by an error of counsel "in light of the fact that attorneys are swearing under penalty of perjury that an offer to you was never on the table. [¶] Your lawyer doesn't need to tell you about an offer that the People are not willing to make."

A defendant who pled guilty demonstrates prejudice caused by counsel's performance in advising him or her to enter the plea "by establishing that a reasonable probability exists that, but for counsel's

18

incompetence, he would not have pled guilty and would have insisted, instead, on proceeding to trial." (*In re Resendiz* (2001) 25 Cal.4th 230, 253, accord, *In re Alvernaz* (1992) 2 Cal.4th 924, 934.) Lopez's different theory is that he can demonstrate prejudice by establishing a reasonable probability that, but for counsel's incompetence, he would not have pled not guilty and gone to trial, but instead would have insisted on accepting the plea offered by the People. We agree with the trial court that this claim cannot succeed, for the evidence shows Lopez was never offered a plea, much less an immigration-safe one.

We need not determine whether there are circumstances in which a defendant who was convicted after pleading not guilty and going to trial can have that conviction vacated under the principles embodied in section 1473.7. Such circumstances are clearly not present in this case. Accordingly, it is not necessary for us to resolve whether section 1473.7 applies to defendants convicted after trial, as Lopez contends.

The judgment is affirmed.

                               _____

                               Kline, P.J.

We concur:

_____

Richman, J.

_____

Stewart, J.

*People v. Lopez* (A159355)